**Opinion filed January 20, 2017**



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00251-CR
_____

## JAMES ROBERT SMITH, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 132nd District Court**
**Scurry County, Texas**
**Trial Court Cause No. 9972**

## M E M O R A N D U M   O P I N I O N

The grand jury indicted James Robert Smith for the murder of his daughter, Mattie Jana-Nicole Smith, and he pleaded not guilty. After a trial, the jury convicted him of that offense.[1] The jury then assessed punishment at confinement for ninety-nine years and a fine of $10,000, and the trial court sentenced him accordingly. On

---

[1]TEX. PENAL CODE ANN. § 19.02 (West 2011).

appeal, Appellant asserts that the trial court should have submitted a voluntariness-of-conduct instruction to the jury. We affirm.

## I. *Evidence at Trial*

Jeannie Marie Smith (now Jeannie Marie Collins) and Appellant were married, and they lived together. Jeannie and Appellant had marital problems. One evening, they got into an argument about Appellant "pass[ing] gas" in the kitchen while Jeannie was cooking. During the argument, Appellant threw a vase at Jeannie and hit her with it. In response, Jeannie swung a broom at him. Jeannie went to the bedroom, and Appellant followed her; she returned to the kitchen, and so did Appellant.

Meanwhile, their adult daughter, Mattie, came into the kitchen. Appellant, Jeannie, and Mattie got into an argument, and Appellant returned to the bedroom. While Appellant was in the bedroom, he said, "I told you you son of b-----s that I was going to f--k y'all up the next time that y'all -- that y'all mess with me." Jeannie said that Appellant "sounded like he was going to do something." She went into the bedroom to try to keep Appellant from getting his revolver out of a nightstand drawer, but Appellant beat her to the drawer.

Appellant pointed the pistol at Jeannie, and she slapped at his hands; Appellant claimed that she had a knife when he shot her. Immediately thereafter, Mattie came into the bedroom. When Mattie went to help Jeannie, Appellant shot Mattie in the chest. The single bullet perforated Mattie's lungs, the right atrium of her heart, and her spleen; she died from those wounds. Appellant fired five shots: four bullets struck Jeannie, and the other bullet struck Mattie.

James Barrows, an officer with the Snyder Police Department, arrived on scene and found two women in a bedroom; both women had been shot. The older victim told Officer Barrows, "He shot us." Officer Barrows spoke to Appellant, who admitted that he had been drinking, and Officer Barrows observed that Appellant

smelled of alcohol and appeared to be intoxicated. Appellant also repeatedly said, "What did I do? What have I done? What have I done?" Appellant also said, "The gun's in the den." Officer Barrows heard Appellant at the scene admit that he shot Mattie. Appellant was then arrested at the scene, read his Article 38.22[2] rights and *Miranda*[3] rights, and then transported to the Scurry County Law Enforcement Center. A forensic evidence and property technician who was at the scene also heard Appellant say, "They shouldn't have woke me up. I shot them because they shouldn't have woke me up."

Appellant testified at trial that the revolver was in his hand as he struggled with Jeannie and that the gun accidentally went off and shot her. He said that, as Mattie entered the room, Jeannie and he fought and struggled over the gun. He said that, as Mattie came toward Jeannie and bent over her, he pulled the gun toward himself, that "it went off" accidentally, and that he "knew [Mattie] was shot." He requested a voluntariness-of-conduct instruction, which the trial court refused to give.

The State called Joseph Mata, a forensic scientist with the Texas Department of Public Safety at the Lubbock Crime Laboratory, who is a specialist in firearms and tool mark identification. He examined the revolver and the bullet fragments. Mata testified that the revolver could fire in single or double action and that, in the "trigger" test, the single action required five pounds of pressure, while the double action required thirteen and one-half pounds of pressure. He also testified that he performed three additional tests on the revolver—the "push off," "jar off," and "rebounding hammer" tests—and that the revolver functioned normally.

---

[2]TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2016).

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

3

## II. *Standard of Review*

Appellant asserts that the trial court erred when it failed to include an instruction to the jury on voluntariness of conduct because the evidence raised the issue. As to harm, Appellant maintains that he requested the instruction and need show only "some harm." When a defensive theory is raised by evidence adduced from any source, the trial court must submit that issue to the jury. *See Reynolds v. State*, 371 S.W.3d 511, 521 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (citing *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997) (holding that a defendant's testimony alone may be sufficient to raise a defensive theory requiring a jury charge)). However, "no error occurs in denying a charge on involuntary conduct where the *evidence* does not raise involuntariness but merely reiterates the defendant's position that he did not intend the resulting injuries." *Pimentel v. State*, 710 S.W.2d 764, 773 (Tex. App.—San Antonio 1986, pet. ref'd) (citing *Williams v. State*, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982); *George v. State*, 681 S.W.2d 43, 47 (Tex. Crim. App. 1984).

## III. *Analysis*

Appellant alleged that, because the gun discharged due to an act by someone other than himself or was a result of impetus from another person, the trial court should have instructed the jury on voluntariness of conduct. We disagree with Appellant's argument for two reasons: (1) Appellant's argument merely negates an element of the offense and (2) Appellant acted voluntarily when he shot Mattie. Therefore, as we explain below, the trial court did not err when it refused to provide the voluntariness-of-conduct instruction. However, even if the trial court erred, which we do not hold, Appellant suffered no harm.

4

*A. Appellant claims that Mattie was "accidentally" shot, but his argument only seeks to negate an element of the offense of murder.*

Appellant testified that Mattie "walked in that room while me and her momma was fighting, struggling over the gun." Appellant said, "[T]he whole time [Jeannie] was trying to get this gun from me, and I was having to change it from one hand to another. And we was wrestling, and I'm not - - I'm right handed." As we have said, Appellant claimed that the gun went off and that it was an accident. The State argues that Appellant has confused accident issues with voluntariness-of-conduct issues; the two terms are not interchangeable. *See Rogers v. State*, 105 S.W.3d 630, 636 (Tex. Crim. App. 2003). In *Rogers*, the court explained that "'accident' was also used under the former penal code to describe a hodgepodge of defenses, including the absence of a culpable mental state, conduct which was voluntary but that differed from the intended conduct, mistake of fact, and an unexpected result." *Id.* at 637 (quoting *Williams*, 630 S.W.2d at 644). Also under the former code, "'intentional' could refer to either the conscious physical commission of the bad act (the *actus reus*) or the mental state (the *mens rea*) with which the defendant committed that act." *Id.*

> Appellant sought have an instruction included that read in part:
>
> Therefore, if you believe from the evidence beyond a reasonable doubt that . . . the Defendant, James Robert Smith, did cause the death of Mattie Jana Nicole Smith, . . . but . . . you have a reasonable doubt thereof that the injury was a result of an accident, . . . you will . . . acquit the Defendant and say by your verdict not guilty.

Under the present code, there is no defense of "accident" because Section 6.01(a) of the Texas Penal Code provides that "[a] person commits an offense only if he voluntarily engages in conduct." TEX. PENAL CODE ANN. § 6.01(a) (West 2011). Section 6.02(a), in turn, addresses the claim that the defendant lacked the required mental state. *Id.* § 6.02(a); *Rogers*, 105 S.W.3d at 637. Under Section 6.01(a), a

movement is involuntary if the movement is a non-volitional result of someone else's act, is set in motion by an independent nonhuman force, or is the result of a reflex or convulsion. *Rogers*, 105 S.W.3d at 638.

Because Appellant sought to prove that he did not have the culpable mental state because the shooting was an "accident," no instruction was needed; Appellant merely attempted to negate an element of the offense. *See Penry v. State*, 903 S.W.2d 715, 748 n.30 (Tex. Crim. App. 1995). In addition, the inclusion of the word "accident" in the requested instruction was erroneous because accident is no longer a defense under the present code.

> ### B. Appellant testified that, as he pulled the gun toward him and away from Jeannie, which was a volitional act by him, the gun discharged.

Appellant argues that the evidence required a voluntariness-of-conduct instruction because there was evidence that his actions were involuntary and that the gun discharged because of Jeannie's actions. The Texas Penal Code requires that an act must be voluntary in order to establish guilt. *See* PENAL § 6.01(a). "'Voluntariness,' within the meaning of Section 6.01(a), refers only to one's own physical body movements." *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (quoting *Rogers*, 105 S.W.3d at 638). Voluntariness and the mental state behind one's conduct are separate issues. *Id.* (citing *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993)). "If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis, or other nonvolitional impetus, that movement is not voluntary." *Whatley*, 445 S.W.3d at 166 (quoting *Rogers*, 105 S.W.3d at 638).

Appellant sought to have the following instruction included in the jury charge:

> You are instructed that a person commits an offense only if he voluntarily engages in conduct. . . . Therefore, if you believe from the

6

> evidence beyond a reasonable doubt that . . . the Defendant, James
> Robert Smith, did cause the death of Mattie Jana Nicole Smith, . . . but
> you have a reasonable doubt thereof that the injury . . . was not the
> voluntary act of conduct of the Defendant, you will . . . acquit the
> Defendant and say by your verdict not guilty.

Conduct is not rendered involuntary merely because an accused does not intend the result of his conduct. *See Adanandus*, 866 S.W.2d at 230. If the accused engages in a voluntary act and has the requisite mental state, his conduct is not rendered involuntary simply because the conduct also included an involuntary act or because the accused did not intend the result of his conduct. *See Cruz v. State*, 838 S.W.2d 682, 686 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd); *Owens v. State*, 786 S.W.2d 805, 809 (Tex. App.—Fort Worth 1990, pet. ref'd). Furthermore, the "voluntary act" requirement does not necessarily go to the ultimate act (e.g., pulling the trigger), but means only that criminal responsibility for the harm must include an act that is voluntary (e.g., pointing the gun). *Mims v. State*, No. 12-02-00178-CR, 2004 WL 949453, at *7 (Tex. App.—Tyler Apr. 30, 2004, pet. ref'd) (mem. op., not designated for publication) (citing *Rogers*, 105 S.W.3d at 638).

In *Mims*, the defendant asserted that he did not intend to shoot the victim because, during the robbery, they struggled over the gun and it went off. Nevertheless, the court held this did not entitle the defendant to a voluntariness instruction because the defendant created the situation when he voluntarily entered the van with the gun, demanded money from the victim, and pointed the gun at the victim. *Mims*, 2004 WL 949453, at *8. In a similar case, *Owens*, the defendant was not entitled to a voluntariness instruction because he loaded a gun, held it out in front of himself, and pointed it toward the deceased. The court held that this was not involuntary conduct. *Owens*, 786 S.W.2d at 810. Likewise, similar conduct was involved in *Pimentel*, which involved a man loading a shotgun and then jogging down the street with his finger on the trigger. 710 S.W.2d at 773. The court held

7

that this was not involuntary conduct even though the defendant claimed the gun just went off. *Id.*

In a case before the Court of Criminal Appeals, it held that, where the defendant's thumb slipped off the hammer, that constituted bodily movement within the meaning of "act" found in Section 1.07(a)(1) of the Penal Code; there was no evidence that the defendant's action was involuntary. *George*, 681 S.W.2d at 47. Here, Appellant argued with Jeannie, retrieved his loaded gun, and cocked the hammer. Appellant said that he and Jeannie struggled and that, as he pulled the gun toward himself, the gun discharged. Like volitional acts in *Mims*, *Owens*, and *Pimentel*, as well as the slight bodily movement of the slipping thumb in *George*, Appellant's actions were volitional.

Appellant argues that the evidence, as in *Brown*, entitled him to a voluntariness-of-conduct instruction. *See Brown*, 955 S.W.2d at 279. In *Brown*, the evidence supported a voluntariness-of-conduct instruction where the defendant testified that he was bumped by a man named Ryan Coleman and that the gun inadvertently discharged. *Id.* Coleman corroborated the defendant's testimony. *Id.* However, because Appellant pulled the gun toward himself and tried to keep control of it as it discharged, his acts are unlike those in *Brown*. Likewise, Appellant's case is not like *Garcia v. State*, where the court held that an instruction was warranted when the victim grabbed the gun from the defendant and caused the gun to discharge. 605 S.W.2d 565, 566 (Tex. Crim. App. [Panel Op.] 1980). Here, Appellant testified that, as he pulled the gun, the gun discharged; he did not testify that Jeannie pulled the gun away from him and then the gun discharged. Appellant's case is not like *Brown* and *Garcia*, and is more akin to *George*, *Mims*, *Owens*, and *Pimentel*.

*C. Even if the trial court erred when it did not include the requested voluntariness-of-conduct instruction, a review of the entire record reveals that Appellant suffered no harm.*

When an appellate court undertakes an *Almanza* harm analysis for jury charge error, the first question is did the defendant preserve error. If he did, then the court will reverse if the error caused some harm to the accused's rights. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). Conversely, if a defendant failed to object to the jury charge error, then the court will reverse if the defendant suffered "egregious harm." *Ngo*, 175 S.W.3d at 743 (citing *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004); *Almanza*, 686 S.W.2d at 171)). Neither the State nor the defendant bears the burden of proving harm; the court must review the entire record to determine if the defendant suffered harm. *See Elizondo v. State*, 487 S.W.3d 185, 205 (Tex. Crim. App. 2016); *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

The harm must be "actual," not just theoretical. *Almanza*, 686 S.W.2d at 174. To decide if some harm occurred, we review the following: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816 (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013)). "This less-stringent standard still requires the reviewing court to find that the defendant 'suffered some actual, rather than merely theoretical, harm from the error.'" *Reeves*, 420 S.W.3d at 816 (quoting *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008)). We will address factors three and two, followed by one and four.

## 1. *Factor Three: The entirety of the evidence is overwhelming against Appellant.*

The third factor for a harm analysis is the entirety of the evidence contained in the record. *Reeves*, 420 S.W.3d at 816. Overwhelming evidence of guilt is a factor to review in a thorough analysis of harm. *Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002). Officer Barrows arrived at the scene and found two women who had been shot. The older victim told Officer Barrows, "He shot us." Jeannie was the older victim, and she testified as to how Appellant and she argued; how he threw a vase at her; how he went to the bedroom and got his gun; and how she heard him cock it. She then said that Appellant stated, "I told you you son of b-----s that I was going to f--k y'all up the next time that y'all -- that y'all mess with me."

When she went into the bedroom, Appellant pointed the gun at her. She slapped his hands away, and he then shot her four times. Mattie then entered the bedroom, and went to help Jeannie, and Appellant shot Mattie once. The bullet perforated her lungs, her heart, and her spleen, and Mattie died from those wounds.

Officer Barrows observed that Appellant smelled of alcohol and appeared to be intoxicated. Officer Barrows spoke to Appellant, who admitted that he had been drinking, and Appellant also repeatedly said, "What did I do? What have I done? What have I done?" Officer Barrows also noticed that Appellant had no defensive wounds on his body.

Appellant told the police on the night of the shooting, "The gun's in the den." But the gun in the den, the Glock, was not used in the shooting. The revolver that was used was found in a blue tote in the bedroom; there was blood on both the revolver and the tote. Mata, a specialist in firearms and tool mark identification, testified that the revolver could fire in single or double action and that, under the "trigger" test, the single action required five pounds of pressure, while the double

action required thirteen and one-half pounds of pressure. He also testified that he performed three additional tests on the revolver—the "push off," "jar off," and "rebounding hammer" tests—and that the revolver functioned normally. In addition, Texas Ranger Phillip Vandygriff mapped the crime scene and explained that Jeannie was on the floor and was shot through the mouth. He described how parts of her teeth were in the carpet below her.

## 2. *Factor Two: The arguments of counsel do not indicate harm.*

Defense counsel made closing arguments in Appellant's defense. Counsel argued that the case did not involve an issue about who was "holding the gun." Counsel also argued that this was an accident, that there was reasonable doubt that Appellant's conduct was "intended" or "intentional," and that only two witnesses saw what happened: Jeannie and Appellant. Counsel acknowledged that Jeannie said Appellant shot Mattie on purpose. Defense counsel argued that this case was either a "straight up accident" or that Appellant shot Mattie intending to do serious bodily injury. Counsel argued that Appellant did not intend to act in a way clearly dangerous to human life. Counsel stated that Appellant's testimony at trial differed "in many respects" from what he told police officers the night that he shot Mattie. Counsel pointed out that, although Appellant had blood on his socks, others in the bedroom had blood on them as well: Jeannie and her son, Jermaine. Counsel surmised that Mattie was shot at close range—it was a contact wound. In closing, defense counsel noted that Appellant lost his daughter and would have to live with that fact the rest of his life. The balance of the defense's arguments were related to intent and accident, not involuntary acts of others.

In response, the State argued that this is a murder case and that Appellant took his revolver, shot his wife four times, and then shot and killed his daughter. The State explained that Jeannie told the jury what happened that day: she and Appellant argued, and he got his gun. When she entered the bedroom, he pointed the gun at

her, and after she slapped at his hands, he shot her four times. Appellant then shot Mattie after she entered the bedroom and tried to help her mother. The prosecutor continued by describing what Officer Barrows saw when he arrived: "I find Jeannie Smith's face shot off and her teeth right down there in the carpet in a huge pool of blood, and Mattie is unresponsive," "laying partially on top of Jeannie." The State encouraged the jury to look at the photos in evidence, which reflected not one injury on Appellant. The State argued that Appellant lied to the officers about where the gun was located and about which gun was used.

The State pointed out that there were no bullet holes where Appellant claimed to have pointed and shot the gun. The State also highlighted Appellant's comments after the shooting: "The whole house is [Jeannie's]. We just fight about money. And nothing I do is good enough." The State pointed to Appellant's anger as a motive. The State argued that Appellant was an angry man and that his anger killed his daughter and maimed his wife. The State argued that Appellant intentionally shot Jeannie multiple times and Mattie once because of his anger and his condition at the time of the shooting.

### 3. *Factor One: The jury charge as a whole does not indicate harm in light of the other factors.*

The trial court prepared a jury charge with several definitions. The trial court instructed the jury that "[a] person commits the offense of murder if the person, with intent to cause serious bodily injury to an individual, commits an act clearly dangerous to human life that causes the death of the individual." The court outlined that "'[s]erious bodily injury' means bodily injury that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." The court explained that "'[d]eadly weapon' means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." The court also provided that "[a] person

12

acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Finally, the court instructed the jury as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about October 26, 2012, in Scurry County, Texas, the defendant, **JAMES ROBERT SMITH**, did then and there, with intent to cause serious bodily injury to an individual, namely, Mattie Jana-Nicole Smith, commit an act clearly dangerous to human life that caused the death of Mattie Jana-Nicole Smith, by shooting her with a deadly weapon, to-wit: a handgun, then you will find the defendant guilty of Murder, as charged in the indictment.

As previously explained, Appellant was not entitled to an instruction that included the word "accident." He also was not entitled to an instruction on voluntariness of conduct because of his volitional movements in pulling the gun toward himself as it discharged. However, even if those facts allowed for a voluntariness-of-conduct instruction, Appellant never presented an instruction only on voluntariness of conduct; his request included "accident." In addition, even if the voluntariness-of-conduct instruction had been in the charge, the result in this case would have been the same.

### 4. *Factor Four: No other relevant factors in the record indicate Appellant suffered harm.*

A review of voir dire indicated that the State focused on eliciting answers from the panel about their thoughts, attitudes, and biases, including whether they were biased against the State because of federal or state government action, the imposition of taxes, unfair treatment by police, or the unfair prosecution of individuals. The State focused on whether someone had decided that, just because the grand jury indicted Appellant and the State prosecuted him, he must be guilty, regardless of the evidence presented. The State also questioned the panel on whether

religious beliefs would preclude them from jury service because they could not "pass judgment on someone else."

The State explained during voir dire that Appellant was not required to testify against himself, that he was presumed innocent, and that his decision not to testify could not be held against him. The State also discussed with the panel members the meaning of intentionally, serious bodily injury, the use of a deadly weapon, transferred intent, and self-defense. The State emphasized how jurors should use their common sense to evaluate evidence and measure the standard of proof for the elements of the offense of murder. The State elicited responses from panel members on what evidence could be presented and how jurors observe and evaluate witness testimony and witness credibility. The State further questioned jurors about the proof needed to prove beyond a reasonable doubt the offense of murder and about whether the State had to prove motive or premeditation. Finally, the State questioned panel members on whether they could consider the full range of punishment if Appellant were convicted of the offense of murder.

Appellant's counsel in voir dire initially focused on the fact that Appellant is not required to prove anything and that the State has the burden of proof; Appellant is presumed innocent until he is proven guilty beyond a reasonable doubt. Appellant's trial counsel questioned panel members about their understanding of "presumed innocent" and proof beyond a reasonable doubt. Appellant's counsel also spoke about investigations, the grand jury system and indictments, and who could be charged with a crime, as well as the types of evidence that could be presented at trial. Appellant's trial counsel also questioned jurors about how witnesses perceive and remember events and the reliability of their testimony. Appellant's trial counsel also questioned panel members about their ability to give Appellant a fair trial and their understanding of intentional or knowing conduct,

accidents, and self-defense. The panel members also answered questions about their understanding and willingness to consider the full range of punishment.

The State's opening statement focused on how Appellant and Jeannie argued; how Appellant went to the bedroom and got a gun; and how, when Jeannie walked into the bedroom, he shot her. The State indicated that the evidence would show that, when Mattie came into the bedroom to help her mother, Appellant shot and killed Mattie. The State mentioned that Appellant fired five shots and that there would be testimony on blood and DNA evidence; it also addressed Appellant's claim that he acted in self-defense.

Defense counsel, in his opening statement, focused on the chaos and lack of common sense the day of the shooting. Defense counsel outlined that Appellant had been drinking, that Appellant argued with Jeannie, that she hit Appellant with a broom, that she attacked Appellant with a knife when she came into the bedroom, and that Appellant feared for his safety. Defense counsel asserts that Appellant and Jeannie struggled over the gun, that it "went off," and that Appellant never intended to shoot his daughter.

After a review of voir dire and opening statements, this court does not find any relevant information that indicates any harm to Appellant. Likewise, a review of the remainder of the record does not yield any other relevant information that would indicate that Appellant suffered harm—even if the trial court erred and should have included a voluntariness-of-conduct instruction.

## IV. *Conclusion*

After a review of the entire record and of all four factors—(1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant information present in the record, we cannot say that Appellant suffered any harm from a failure to include his instruction on accident, an instruction that was not allowed under the law. Moreover, as to the voluntariness-of-conduct

15

instruction, the trial court was not required to submit an instruction because there was no evidence that Appellant's actions were involuntary. However, even if we were to assume that the trial court erred, which we do not hold, we hold that any error was harmless in light of the four applicable factors, including the overwhelming evidence of guilt, and that any omission did not injure Appellant's rights. We overrule Appellant's sole issue on appeal.

V. *This Court's Ruling*

We affirm the judgment of the trial court.


MIKE WILLSON

JUSTICE


January 20, 2017

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.